**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| : | Case No. 1:20-cv-6053 |
| STONINGTON CAPITAL ADVISORS, : | |
| LLC and STONINGTON DRIVE : | |
| SECURITIES LLC : | **PETITION TO VACATE IN PART** |
| : | **AND CONFIRM IN PART** |
| Petitioners, : | **THE MAY 26, 2020** |
| v. : | **ARBITRATION AWARD** |
| : | |
| SOUTHFIELD CAPITAL, LLC, : | |
| : | |
| Respondent. : | |
| : | |
| : | |

Petitioners Stonington Capital Advisors, LLC and Stonington Drive Securities LLC (collectively, "Stonington") hereby petition to vacate in part and confirm in part the May 26, 2020, arbitration award ("Award"), and state the following as against Respondent Southfield Capital, LLC ("Southfield"):

**NATURE OF THE ACTION**

1.     Stonington commences this proceeding pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, to vacate in part and confirm in part the Award that was rendered by a single arbitrator, the Hon. Jonathan Lippman (ret.), in New York City, New York, on May 26, 2020.  A copy of the Award is annexed hereto as Exhibit A.

2.     Stonington seeks vacatur of the Award's expressly contradictory determination that forfeited its vested right under Section 6 of the parties' Placement Agent Agreement dated June 20, 2014 ("Agreement") to serve as the exclusive placement agent for Southfield's Successor Fund, which right Stonington had earned as compensation for its successful performance of fundraising services for Southfield's private equity fund, Southfield

Partners II ("Southfield II" or "Fund").[1]  A copy of the Agreement is annexed hereto as Exhibit B.  This determination manifestly disregarded and ignored controlling New York law providing that (a) a contingent contractual right becomes vested upon satisfaction of the condition precedent to its vesting; and (b) a vested contractual right cannot be unilaterally terminated by the other contracting party.[2]  Stonington seeks judicial enforcement of its vested, earned Section 6 right to serve as exclusive placement agent for Southfield's Successor Fund.

3.      Stonington seeks confirmation of the Award's determination that Stonington is entitled under Section 3(iv) of the parties' Agreement to "re-up Fees" it had earned for its successful performance of fundraising services for the Fund.

## THE PARTIES

4.      Stonington Capital, a Delaware limited liability company, is a placement agent for middle market private equity firms with its principal office in Short Hills, New Jersey.  Its primary function is to introduce prospective investors and to facilitate investments by prospective investors in private equity funds.  Its members are Dana Pawlicki and Justin Garrod, both of whom are residents of the State of New Jersey.

5.      Stonington Securities, a Delaware limited liability company, is a registered broker-dealer with the U.S. Securities and Exchange Commission and a member-firm of the Financial Industry Regulatory Authority.  It is owned 100% by Stonington Capital.

6.      Southfield, a Delaware limited liability company, is a lower middle market private equity firm with its principal office in Greenwich, Connecticut.  Its members are

---

[1] Notwithstanding Southfield's clerical error in the Agreement defining the "Fund" as "Southfield Partners III," the "Fund" is Southfield Partners II.
[2] Section 14 of the Agreement provides that it "shall be governed, construed and interpreted in accordance with the laws of the State of New York."

Andrew Levison and Jonathan Goldstein, both of whom are residents of the State of Connecticut.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as neither member of Southfield is a citizen of the same state as any of the members of Stonington Capital and Stonington Securities, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.     Venue is appropriate in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 and 9 U.S.C. § 10(a), as the arbitration occurred and the Award was made in New York City, New York.

## FACTUAL ALLEGATIONS

A.     **The Placement Agent Agreement**

9.     In June 2014, Southfield, Stonington Capital, and Profor Securities, LLC ("Profor")[3] executed the Agreement, which provides that Southfield would engage Stonington Capital and Profor as exclusive "Placement Agents" for Southfield's private equity fund, Southfield II.

10.     Among the placement agent services set forth in Section 2 of the Agreement, Stonington agreed to "[i]ntroduce prospective Investors to [Southfield] and facilitate Investments by prospective Investors."[4]

11.     Section 13 of the Agreement provides that the "**Term**" of Stonington's engagement would commence "on the date hereof and will continue until the date of the final

---

[3] Profor's rights were assigned to Stonington Securities in August, 2017.  Accordingly, Profor was not a party to the underlying arbitration proceeding and is not a party to this civil action.

[4] The term "Investor" is defined in Section 1(f) of the Agreement as "any person admitted to the Fund other than an Excluded Investor."  The term "Investment" is defined in Section 1(g) of the Agreement as "a subscription made to the Fund or the Successor Fund by an Investor that has been accepted by [Southfield] in writing."

closing of the Fund."  Pursuant to Section 13 of the Agreement, the "Term" of Stonington's engagement commenced as of June 20, 2014, and "continued to the date of the final closing of the Fund," which occurred on July 30, 2017.

12.   Section 3 of the Agreement provides that Southfield shall compensate Stonington for its performance of placement agent services as follows:

a.   Section 3(ii) provides Southfield will pay Stonington "a Fee equal to 2.0% of the Investment in the Fund made by each Investor."

b.   Section 3(iv) provides Southfield shall pay Stonington a Fee equal to 1% of the amount of each Investment in the Successor Fund made by an Investor that had invested in the Fund.  These Fees are "re-up" Fees.

13.   As additional compensation for its performance of services as Placement Agents for the Fund, Section 6 of the Agreement provides Stonington with a right to act as placement agent for Southfield's Successor Fund on the condition that the Fund have "received aggregate Investments of at least $125 million."  Section 6 of the Agreement provides:

> 6.  The Client or its Affiliate shall provide the Placement Agents with written notice of its intent to launch the Successor Fund not fewer than 180 days prior to the first closing of the Successor Fund (the "Successor Fund Notice").  **The Placement Agents shall have the right to act as placement agent for the Successor Fund** upon providing the Client or its Affiliate, as applicable, with notice of their intent to do so delivered not more than 90 days after the date of their receipt of the Successor Fund Notice.  **The Placement Agents' right in the preceding sentence is conditioned on the Fund having received aggregate Investments of at least $125 million.**  [Emphasis added.]

**B.   Stonington's Section 6 Right To Act As Placement Agent For Southfield's Successor Fund Becomes A Vested Right**

14.   By June 2017, the "aggregate Investments" received by the Fund exceeded $125 million.

15.     The final Investments in the Fund closed on July 30, 2017, and with them, the Fund closed after receiving approximately $200 million in capital commitments, reaching its hard cap and exceeding its target of $175 million in capital commitments.

16.     As of the Fund's close on July 30, 2017, the Fund had received aggregate Investments substantially exceeding the $125 million of aggregate Investments needed for Stonington's Section 6 right to vest.

17.     The sole condition for the vesting of Stonington's Section 6 right was satisfied as of June, 2017.

18.     Stonington acquired a vested right in June, 2017 to act as the exclusive placement agent for Southfield's Successor Fund.

**C.      Southfield Sends A Notice To Terminate The Agreement**

19.     Although the Term of Stonington's engagement had concluded with the close of the Fund in July 2017, Southfield sent a letter to Stonington on December 7, 2017, stating:

> Thank you for your help with the successful formation of Southfield Capital II LP.  We greatly appreciate your efforts.
>
> Now that the Fund had its' [sic] final close on 7/31/2017, our attorney has recommended that, in accordance with Section 13 of the Placement Agent Agreement, we send this letter as formal notification that the Placement Agent Agreement is hereby terminated.
>
> That said, we thank you for your help with the successful formation of Southfield Capital II LP and want you to know that we greatly appreciate your efforts.  We look forward to future opportunities together.

20.     Southfield explained the purpose of the notice.  "We noticed that while Stonington's 'engagement' ends as of the final closing, the agreement itself doesn't self-

terminate.  So we still think it makes sense to go ahead and terminate the agreement as activities related to the offering have concluded."

21.     In response to the notice, Stonington reminded Southfield: "We also look forward to working with you on future opportunities, including acting as placement agent for Southfield's Successor Fund, a right we earned when the Fund exceeded $125 million in capital commitments."

**D.     Southfield Denies Stonington's Vested, Earned Right To Act As Placement Agent And Demands Arbitration**

22.     In the summer of 2019, Southfield decided to form the Successor Fund.

23.     The Successor Fund, Southfield Capital III, LP, was formed in 2020.

24.     On August 20, 2019, Southfield advised Stonington that Southfield had "'made the strategic decision not to use Stonington' for Southfield's next fundraise."

25.     Nevertheless, in an e-mail dated October 3, 2019, Southfield provided Stonington with notice of Southfield's intent to launch the Successor Fund, stating "[w]e are targeting a $300 million fund-raise for the next fund . . . ."

26.     In accordance with the procedure set forth in Section 6, Stonington timely delivered written notice of its intent to exercise its right to act as placement agent for the Successor Fund and again reiterated that it had earned the right to act as placement agent for the Successor Fund, which right vested when the Fund "received aggregate Investments of at least $125 million."

27.     Section 14 of the Agreement provides:  "Any disputes between the parties relating to the terms of this Agreement, or the breach thereof, shall be submitted to binding arbitration in New York, New York, in accordance with the rules of the American Arbitration Association [AAA]."

28.     In November 2019, Southfield filed with the AAA a Demand for Arbitration claiming that "because the Agreement had terminated," Southfield did not intend to engage Stonington as the placement agent for its Successor Fund.  Southfield's Demand for Arbitration also sought an award releasing it from its obligation to pay Stonington its Section 3(iv) Fees.

29.     Although Southfield admitted the sole condition for Stonington's Section 6 right to vest was satisfied before it sent its notice of termination, Southfield sought a declaratory judgment relieving it of its Sections 3(iv) and 6 obligations to Stonington.

30.     Stonington Capital filed a counterclaim, and Stonington Securities asserted a third-party claim, seeking (i) a declaration that, pursuant to Section 6, Southfield is obligated to engage Stonington as the placement agent for the Successor Fund; and an award of specific performance of Section 6 or, alternatively, money damages in an amount equal to 2% of all Investments made to the Successor Fund by Investors that did not invest in the Fund; and (ii) a declaration that Stonington is entitled to re-up Fees pursuant to Section 3(iv).

**E.     The Arbitration Award**

31.     After conferring with the arbitrator, the parties agreed with the arbitrator to a summary proceeding based upon written submissions.

32.     Following the written submissions and oral argument, the arbitrator rendered the Award "find[ing] there to be two issues that are fundamental to the resolution of this matter":  "First, whether Southfield's December 7, 2017 email to Stonington constituted termination of the Agreement under Section 13.  Second, whether Stonington is entitled to any fees for the Successor Fund under Sections 3 and 6."

33.     The Award properly held that notwithstanding Southfield's termination of the Agreement, Stonington is entitled to its Section 3(iv) Fees because "[s]uch re-up fees would emanate from compensation Stonington had already earned for its prior work in the original Fund" and barring Stonington from collecting such fees "would allow Southfield to receive the benefit of Stonington's services without having to compensate Stonington for the same services."   The Award specifically held that "[t]he clear language of the Agreement affords Stonington the right to receive compensation for such work."

34.     Disregarding and ignoring controlling legal authority, and expressly contradicting its determination that Stonington had earned and was entitled to its Section 3(iv) Fees, the Award concluded that Southfield's termination of the Agreement caused a loss or forfeiture of Stonington's earned and vested Section 6 right to act as placement agent for the Successor Fund.

35.     Notwithstanding that the Award referred to the undisputed and admitted fact that the condition precedent—that Southfield II received aggregate Investments of at least $125 million—had been satisfied before Southfield's termination of the Agreement, thereby creating a vested right, the Award completely disregarded and ignored New York law that a contingent contractual right vests upon the satisfaction of the condition precedent to its vesting.

36.     Further disregarding and ignoring controlling legal authority and the clear and unambiguous language of the Agreement, the Award concluded that Stonington's Section 6 right, which, identically to Stonington's Section 3(iv) right, "emanated from compensation Stonington had already earned for its prior work for the original Fund," was lost and forfeited by, and did not "survive," Southfield's unilateral, no-cause, post-completion-of-Term termination of the Agreement.

## COUNT I
**(Vacatur of Section 6 Determination of the May 26, 2020, Arbitration Award)**

37.     Stonington repeats the allegations of paragraphs 1 through 36 set forth above as though set forth at length herein.

38.     The Award manifestly disregarded and ignored well-defined, explicit, and clearly applicable controlling New York law, of which the arbitrator was made aware, and the plain and unambiguous language of the Agreement, by erroneously concluding that Stonington's earned Section 6 right had not vested and was lost and forfeited by Southfield's unilateral, no-cause, post-completion-of-Term termination of the Agreement.

39.     Granting Stonington a contingent right to act as placement agent for the Successor Fund, Section 6 provides that Stonington "shall have the right to act as placement agent for the Successor Fund" upon the satisfaction of a single condition precedent:  that Southfield II "received aggregate Investments of at least $125 million."

40.     As the Fund received aggregate Investments of at least $125 million by June 2017, the sole condition precedent to the vesting of Stonington's Section 6 right was satisfied prior to Southfield's December, 2017 termination of the Agreement.

41.     The Award manifestly disregarded and ignored controlling New York law, of which the arbitrator was aware, that when contractual rights are subject to conditions precedent, such rights vest upon the satisfaction of their conditions precedent.

42.     Without citing any language in the Agreement or any supporting legal authority, the Award erroneously concluded that "Section 6 and its 'shall' language do not survive Southfield's termination of the Agreement."  The Award manifestly disregarded and completely ignored the controlling New York law recited in *Kolbe v. Tibbetts*, 3 N.E.3d 1151,

1157 (N.Y. 2013), that the word "shall" used in a contract "evinces the mandatory nature of the obligation, insulating it from unilateral alteration."

43.     The Award also manifestly disregarded the United States Supreme Court's recent decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020), to which Stonington also cited in its arbitration submission, which confirmed the "mandatory language: 'shall' . . . creates an obligation impervious to discretion" and that "[u]nlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."

44.     The Award further manifestly disregarded and completely ignored the controlling New York law recited in *Kolbe*, 3 N.E.3d at 1156, of which the arbitrator was aware, that "[r]ights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement."

45.     The Award's determination that Section 6 was always contingent on Southfield's decision on whether or not to terminate the Agreement contradicts the clear and unambiguous language of Section 6 providing that Stonington "shall have the right to act as placement agent for the Successor Fund."

46.     The Award impermissibly created and inserted into the Agreement a new condition to the vesting of Stonington's earned Section 6 right that does not appear anywhere in the text of the Agreement:  that the right to be placement agent for the Successor Fund was subject to Southfield's unilateral decision not to terminate the Agreement, which could be exercised at any time, even after the right had been earned by Stonington and had vested.

47.     The Award manifestly disregarded and ignored controlling New York law, of which the arbitrator was aware by citing it in the Award, that a court may not rewrite

into a contract conditions the parties did not insert by adding or excising terms under the guise of construction.

48.     The Award read the words "shall have the right" completely out of Section 6, thereby manifestly disregarding and ignoring controlling New York law, of which the arbitrator was aware when he quoted it in the Award, that "a court construing a contract must adopt an interpretation which gives meaning to every provision of the contract, so that no provision is left without force and effect."

49.     Based upon the foregoing errors of law, the Award's determination that Stonington' earned Section 6 right did not "survive" Southfield's December, 2017 termination of the Agreement did not rest on a colorable interpretation of the law, constituted a fundamental mistake of law, and caused an automatic forfeiture of Stonington's vested Section 6 right in manifest disregard of the law.

50.     The Award manifestly disregarded and ignored controlling New York law, of which the arbitrator was aware, that "a provision extinguishing rights or obligations will not be implied absent clear and express language to that effect."

51.     Although the Award acknowledged that the Agreement "does not specifically say [the Section 6 right] does not survive," the Award manifestly disregarded and ignored controlling New York law that because "the law abhors a forfeiture, it is the duty of the court to interpret the agreement strictly in order to avoid such a result."

52.     The Award manifestly disregarded and ignored controlling New York law, of which the arbitrator was aware, prohibiting the unilateral termination of a contract from causing the forfeiture of a party's right to receive compensation that "had been earned and was vested."

53. *Kolbe*, *Maine Community*, and other controlling authority, all of which the arbitrator was aware, establish that Southfield's December, 2017 termination of the Agreement could have no legal effect on Stonington's earned Section 6 right because it had vested before Southfield unilaterally terminated the Agreement.

54. As the Award manifestly disregarded and ignored multiple well-defined, explicit, and clearly applicable and controlling principles of New York law, including law from the New York Court of Appeals, the Award's determinations that Southfield is not obligated to perform its Section 6 obligation to Stonington and that Stonington does not possess an enforceable Section 6 right to be the placement agent for Southfield's Successor Fund must be vacated.

**WHEREFORE**, Petitioners Stonington Capital Advisors, LLC and Stonington Drive Securities LLC demand Judgment on Count I of this Petition against Respondent Southfield Capital, LLC, as follows:

A. Vacating the Award's determination that Southfield is not obligated to engage Stonington as placement agent for its Successor Fund, Southfield Capital III, LP, and entering judgment on Stonington's counterclaim specifically enforcing Stonington's contractual right to be engaged as the exclusive placement agent for Southfield's Successor Fund, Southfield Capital III, LP;

B. Alternatively, awarding Stonington money damages equal to two percent (2%) of the value of all capital Investments in the Successor Fund, Southfield Capital III, LP;

C. Awarding Stonington attorneys' fees, costs, and expenses in connection with this Petition pursuant to Section 12(a) of the Agreement; and

D.      Awarding such other relief as the Court deems just and equitable.

## COUNT II
### (Vacatur of Section 6 Determination of the May 26, 2020, Arbitration Award)

55.      Stonington repeats the allegations of paragraphs 1 through 54 set forth above as though set forth at length herein.

56.      The Award manifestly disregarded well-defined, explicit, and clearly applicable controlling New York law, of which the arbitrator was made aware, and the plain and unambiguous language of the Agreement, by making expressly contradictory determinations as to Southfield's obligations under Sections 3(iv) and 6 of the Agreement.

57.      The Award determined that "Stonington is entitled to 're-up fees' as described in Section 3(iv) with respect to any investments to the Successor Fund from investors who previously invested in the Fund."

58.      Adhering to the plain language of the Agreement, the Award determined that re-up Fees resulting from investments in Southfield's Successor Fund are derived from investments in the Fund:  "Such re-up fees would emanate from compensation Stonington had already earned for its prior work in the original Fund."

59.      The Award expressly rejected Southfield's claim that its termination of the Agreement had released Southfield from its obligation to pay Section 3(iv) re-up Fees to Stonington, concluding that Southfield's claim contradicted New York law "meant to protect placement agents to[] ensure that a principal does not receive the benefit of an agent's services and then refuse to pay for those services."

60.      The Award specifically recognized that Southfield's position "would allow Southfield to receive the benefit of Stonington's services without having to compensate

Stonington for the same services.  The clear language of the Agreement affords Stonington the right to receive compensation for such work."

61.   Expressly contradicting its determination awarding Section 3(iv) Fees for services rendered to the Fund, the Award reached the opposite conclusion in determining that Southfield's termination of the Agreement caused a loss or forfeiture of Stonington's earned and vested Section 6 right to act as placement agent for the Successor Fund.  Stonington's earned Section 6 right "emanated from compensation Stonington had already earned for its prior work for the original Fund."  The Award's determination as to Stonington's Section 6 right also contradicted controlling New York law that was "meant to protect placement agents to [] ensure that a principal does not receive the benefit of an agent's services and then refuse to pay for those services."

62.   In denying Stonington's vested, earned Section 6 right to compensation while granting Stonington's vested, earned Section 3(iv) right to compensation, when both rights "emanated from compensation Stonington had already earned for its prior work for the original Fund.," the Award made expressly contradictory determinations respecting Stonington's rights and Southfield's obligations under the Agreement without any colorable justification.

63.   The Award's inherently contradictory determinations respecting Stonington's rights and Southfield's obligations under Sections 3(iv) and 6 of the Agreement are impossible to square and constitute a manifest disregard of the law, such that the Award's determination as to Section 6 must be vacated.

**WHEREFORE**, Petitioners Stonington Capital Advisors, LLC and Stonington Drive Securities LLC demand Judgment on Count II of this Petition against Respondent Southfield Capital, LLC, as follows:

A.    Vacating the Award's determination that Southfield is not obligated to engage Stonington as placement agent for its Successor Fund, Southfield Capital III, LP, and entering judgment on Stonington's counterclaim specifically enforcing Stonington's contractual right to be engaged as the exclusive placement agent for Southfield's Successor Fund, Southfield Capital III, LP;

B.    Alternatively, awarding money damages equal to two percent (2%) of the value of all capital Investments in the Successor Fund, Southfield Capital III, LP;

C.    Awarding Stonington attorneys' fees, costs, and expenses in connection with this Petition pursuant to Section 12(a) of the Agreement; and

D.    Awarding such other relief as the Court deems just and equitable.

## COUNT III
### (Confirmation of Section 3(iv) Determination of the May 26, 2020, Arbitration Award)

64.    Stonington repeats the allegations of paragraphs 1 through 63 set forth above as though set forth at length herein.

65.    The Award determined that "Stonington is entitled to 're-up fees' as described in Section 3(iv) with respect to any investments to the Successor Fund from investors who previously invested in the Fund."

66.    Adhering to the plain language of the Agreement, the Award determined that Section 3(iv) re-up Fees resulting from investments in Southfield's Successor Fund are derived from investments in the Fund:  "Such re-up fees would emanate from compensation Stonington had already earned for its prior work in the original Fund."

67.     The Award expressly rejected Southfield's claim that its termination of the Agreement had released its obligation to pay Section 3(iv) re-up Fees to Stonington, concluding that Southfield's claim contradicted New York law "meant to protect placement agents to[] ensure that a principal does not receive the benefit of an agent's services and then refuse to pay for those services."

68.     The Award specifically recognized that Southfield's position "would allow Southfield to receive the benefit of Stonington's services without having to compensate Stonington for the same services.  The clear language of the Agreement affords Stonington the right to receive compensation for such work."

69.     The Award provided legal authority and colorable justification for concluding that Southfield is obligated to perform its Section 3(iv) obligation to pay re-up Fees to Stonington.

**WHEREFORE**, Petitioners Stonington Capital Advisors, LLC and Stonington Drive Securities LLC demand Judgment on Count III of this Petition against Respondent Southfield Capital, LLC, as follows:

A.     Confirming the Award's determination that Southfield is obligated to pay to Stonington Fees as provided in Section 3(iv) of the Agreement;

B.     Awarding Stonington attorneys' fees, costs, and expenses pursuant to Section 12(a) of the Agreement; and

C.      Awarding such other relief as the Court deems just and equitable.

ORLOFF, LOWENBACH, STIFELMAN
& SIEGEL, P.A.

Dated:  August 3, 2020

*/s/  Jeffrey M. Garrod*
Jeffrey M. Garrod, Esq.
44 Whippany Road, Suite 100
Morristown, New Jersey 07960
Telephone: (973) 622-6200
Fax: (973) 622-3073
Email: jmg@olss.com

*Attorneys for Petitioners*
*Stonington  Capital  Advisors,  LLC  and*
*Stonington Drive Securities LLC*

# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between

Case Number: 01-19-0004-0393

Southfield Capital, LLC                                   ("Claimant")

-vs-

Stonington Capital Advisors, LLC and Stonington Drive Securities LLC     ("Respondents")

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated June 20, 2014, and having been duly sworn, and oral hearings having been waived in accordance with the Rules, and having fully reviewed and considered the written documents submitted to me by the Claimant, Southfield Capital, LLC , represented by Jill O'Toole, Esq. and Allison Baker, Esq., and Respondent, Stonington Capital Advisors, LLC, and Stonington Drive Securities LLC, a third party added, represented by Jeffrey Garrod, Esq., Alex Firsichbaum, Esq., and Craig Ollenschleger, Esq., do hereby, AWARD, as follows:

## I.    INTRODUCTION

The primary issue before this Arbitrator is whether the plain language of the Placement Agent Agreement supports Southfield's December 7, 2017 termination of the Placement Agent Agreement and entitles Stonington to certain rights with respect to a Successor Fund.  The Arbitrator reaffirms fundamental principles of contract interpretation and holds that the plain language of the contract supports Southfield's termination of the Agreement and provides Stonington with certain fees in connection with a Successor Fund.

## II.    FACTS

Claimant and Third-Party Respondent Southfield Capital, LLC ("Southfield") is a Connecticut limited liability company based in Greenwich, Connecticut.  Southfield is a private equity firm that invests in lower-middle market companies with growth potential.

Respondent Stonington Capital Advisors, LLC ("Stonington") is a Delaware limited liability company with its primary office in Short Hills, New Jersey.  Stonington is a placement and advisory firm that provides fund placement and advisory services for private equity vehicles.  Non-party Profor Securities, LLC ("Profor") is a New York limited liability company and a registered broker-dealer.  Third-Party Claimant Stonington Drive Securities LLC ("Stonington Securities") is a registered broker-dealer. Stonington is affiliated with Stonington Securities and is its sole shareholder.

Southfield, Stonington, and Profor entered into a Placement Agent Agreement ("Agreement") on June 20, 2014.  Under the terms of the Agreement, Southfield retained Stonington as Southfield's placement agent for purposes of raising capital for its Fund, Southfield Capital II, L.P. (the "Fund"). Stonington's primary duties as Southfield's placement agent included introducing potential investors to the Fund and assisting in facilitating these investments.  The Agreement designates both Stonington and Profor as Southfield's "Placement Agents."  *See Agreement* p. 1.  As discussed below, the Agreement contemplated that, after the Fund's close, Southfield might raise a Successor Fund.  *See Agreement* § 1(g). The Agreement, therefore, included certain provisions regarding such Successor Fund.  *See, e.g.*, *Agreement* §§ 3(iv); 6.

In July 2017, the Fund closed.  Section 8 of the Agreement provides Stonington the right to assign Profor's rights to another broker-dealer on the premise that "Stonington may in the future become a licensed broker-dealer or may become associated with a broker-dealer other than Profor."  *Agreement* § 8. On August 28, 2017, Stonington, Stonington Securities, and Profor executed an Assignment Agreement. Pursuant to the Assignment Agreement, Profor assigned its rights to Stonington Securities, another broker-dealer that Stonington Capital Advisors had recently established.  On December 7, 2017, Southfield sent Stonington a notice of termination that it argues formally terminated the Agreement.  *See Southfield Demand for Arbitration* at 6.  In August 2019, Southfield considered raising a Successor Fund.  In mid-August 2019, Southfield notified Stonington that it did not intend to retain Stonington as a placement agent for the Successor Fund.  *See Southfield Demand for Arbitration* at 6.  In response, Stonington disputed the Agreement's termination, which ultimately resulted in the arbitration herein.

## III.        PROCEDURE

On October 3, 2019, Southfield notified Stonington that it disagreed with Stonington's interpretation of the Agreement and that if the parties were not able to resolve the dispute, Southfield intended to invoke Section 14 of the Agreement.  *See Southfield Demand for Arbitration* at 7.  Pursuant to Section 14 of the Agreement, Southfield, Stonington, and Profor agreed that any disputes between the parties relating to the Agreement were to be governed, construed, and interpreted in accordance with the laws of the State of New York and submitted to binding arbitration in accordance with the rules of the American Arbitration Association.  *See Agreement* § 14.

As required under Section 14 of the Agreement, the parties then attempted to resolve the dispute among themselves during the 30 days following Southfield's October 3, 2019 communication.  *See Agreement* § 14; *see also Stonington Demand for Arbitration* at 7.  After the parties were unable to come to a resolution, Southfield filed its Demand for Arbitration on November 14, 2019.  Stonington subsequently filed a counterclaim and added Stonington Drive Securities, LLC, as a third-party claimant on December 16, 2020.  On March 6, 2020, the parties submitted motions in support of a summary disposition.  The parties subsequently filed opposition and reply briefs.  The Arbitrator heard oral arguments in support of the parties' motions on April 17, 2020.

## IV.        THE AGREEMENT

### A.        Relevant Provisions

There are several key provisions of the Agreement that are relevant to the instant dispute. Primarily, the parties dispute the application of Section 6 and Section 13 of the Agreement.  Section 13 is the provision that governs when a party is permitted to terminate the Agreement and states:

The placement Agents' engagement will commence on the date hereof and will continue until the date of the final closing of the Fund (the "Term"); provided, that either the Client, Profor or Stonington may terminate this Agreement at any time on thirty (30) days' advance written notice, or immediately on written notice to the other party if the other party is in material breach of any representation, warranty, covenant or other obligation under this Agreement that has not been cured within a reasonable amount of time after delivery of notice of such breach (if remedy is possible).   No expiration or termination of the Agreement will affect the matters set out in this Section or in Section 3 with respect to an Investor who is approached by a member of the Placement Agents regarding in connection with [sic] its duties under this Agreement or for accrued and unpaid expenses incurred prior to the expiration or termination of this Agreement), and Sections 4, 9, 10, 11, 12, 13, 14 and 15 of the Agreement.

*Agreement* § 13.

Section 6 relates to the conditions under which the Placement Agents would have the right to serve as placement agents for the Successor Fund.  Pursuant to Section 6:

The Client or its Affiliate shall provide the Placement Agents with written notice of its intent to launch the Successor Fund not fewer than 180 days prior to the first closing of the Successor Fund . . .  The Placement Agents shall have the right to act as placement agent for the Successor Fund upon providing the Client or its Affiliate, as applicable, with notice of their intent to do so delivered not more than 90 days after the date of their receipt of the Successor Fund Notice.   The Placement Agents' right in the preceding sentence is conditioned on the Fund having received aggregate Investments of at least $125 million.

*Agreement* § 6.

Although not necessarily a key item of dispute among the parties, Section 3 of the Agreement is relevant insofar as it sets the terms for any fees that might be rendered for placement agent services.  Specifically, Section 3(iv) discusses fees for the Successor Fund and states:

If Client accepts an Investment in the Successor Fund from a Investor that has invested in the Fund, Client shall pay to Profor a Fee equal to 50% of the amount that would otherwise be payable to Profor pursuant to this Agreement if such Investment were made to the Fund.

*Agreemen*t § 3(iv).

## B.      Southfield and Stonington's Dispute

The Arbitrator finds there to be two issues that are fundamental to the resolution of this matter.  First, whether Southfield's December 7, 2017 email to Stonington constituted termination of the Agreement under Section 13.  Second, whether Stonington is entitled to any fees for the Successor Fund under Sections 3 and 6.

With respect to whether the Agreement was terminated pursuant to Section 13, Southfield argues that its December 7, 2017 email terminated the Agreement.   Stonington argues that the Agreement

terminated on its own terms on the close of the Fund, and that a reasonable party would not have signed an agreement that could be terminated without cause at any time. Regardless of whether the Agreement expired on its own terms or whether Southfield terminated the Agreement on December 7, 2017, Stonington in effect argues that the date of termination is irrelevant so long as certain conditions described herein were met.

Regarding Stonington's right to serve as placement agent for the Successor Fund and Sections 3 and 6, Southfield argues that Section 6, which establishes the conditions for Placement Agents for the Fund to serve as placement agents for the Successor Fund, does not survive termination, as it is not specifically listed as one of the surviving provisions. Southfield further argues that regardless of whether Stonington has the right to serve as placement agent for the Successor Fund, Section 3(iv), which involves "re-up" fees for any investors from the Fund that also invest in the Successor Fund, does not survive because it is limited by the defined terms of the Agreement as well as the language of Section 13. Specifically, Southfield asserts that the re-up fees do not survive because Section 13 states that termination does not affect fees with respect to Investors, which is further defined in the Agreement as persons admitted to the Fund.

In contrast, Stonington states Section 6 survives termination, as the language of Section 13 does not state that Section 6 will *not* survive. Stonington further asserts that its right to serve as placement agent for the Successor Fund was a vested right conditioned upon the Fund having received aggregate investments of at least $125 million pursuant to Section 6. Thus, Stonington argues that once the Fund received $125 million in investments, Stonington's right to serve as placement agent for the Successor Fund became vested. Stonington asserts that because Southfield terminated the Agreement after the $125 million condition was met, Stonington's right to serve as placement agent for the Successor Fund had already vested and, therefore, remains unaffected by the purported termination.

## V.      CONTROLLING LEGAL STANDARDS

Under New York law, if the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract. *See Greenfield v. Philles Records*, 98 NY2d 562, 569 (2002). If the contract is clear and unambiguous, the words and phrases used by the parties must be given their plain meaning. *Brooke Grp. v. JCH Syndicate 488*, 87 NY2d 530, 534 (1996). Extrinsic and parole evidence is not admissible for clear and unambiguous agreements to create an ambiguity. *W.W.W. Assocs. v. Giancontieri*, 77 NY2d 157, 566 (1990). In addition, a court construing a contract must adopt an interpretation which gives meaning to every provision of the contract, so that no provision is left without force and effect. *Rhoda v. Rhoda*, 175 AD3d 1572, 1573 (2d Dept 2019). "A contract should be read as a whole, with every part interpreted with reference to the whole; if possible, the contract will be interpreted so as to give effect to its general purpose." *Kaplan v. Kaplan*, 174 AD3d 691, 693 (2d Dept 2019).

When interpreting a contract under New York law, "the intention of the parties should control, and the best evidence of intent is the contract itself." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013). There is a presumption that agreements that are deliberately prepared and negotiated between sophisticated parties demonstrate the intent of the parties. *Zacharius v. Kensington Publ'g Corp.*, 167 AD3d 452 (1st Dept 2018); *Grandfeld II, LLC v. Kohl's Dep't Stores, Inc.*, 163 AD3d 782, 783 (2d Dept 2018). Where the instrument was between sophisticated, counseled business people negotiating at arm's length, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Vermont Teddy Bear Co., Inc. v. Madison Realty Co.*, 1 NY3d 470, 475 (2004) (internal quotation marks omitted).

## VI.    ANALYSIS

Southfield argues that the Agreement terminated when Southfield sent Stonington the December 7, 2017 email, while Stonington argues the Agreement automatically terminated upon the Fund's close. Under New York law, if the terms of a contract are clear and unambiguous, then words and phrases used by the parties must be given their plain meaning. *Brooke Grp.* at 534. Here, the plain language of Section 13 of the Agreement – specifically, that "the Client . . . may terminate this Agreement at any time" – supports Southfield's conclusion that it was free to terminate the Agreement at any time, including after the Fund's close. Further, the right to terminate at any time is consistent with the overall purpose of the Agreement when read as a whole. Absent any language in Section 13 to support a finding to the contrary, the Arbitrator finds Southfield had a right to terminate the Agreement on December 7, 2017.

Finding the Agreement to be properly terminated, the Arbitrator turns to the question of whether Section 6 and Section 3(iv) survive termination under Section 13.

The Arbitrator does not agree with Stonington's interpretation that Section 6 survives termination or expiration. As the governing law prescribes, "[a] court may not rewrite into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meeting." *Slamow v. Delcol*, 174 AD2d 725, 726 (2d Dept 1991). Although the language does not specifically say it does not survive, a plain and reasonable interpretation of the language of the contract supports a logical conclusion that it would not. Nor does the Arbitrator agree with Stonington's argument that the termination provision does not have a survival clause. Section 13 lists nine specific provisions that will not be "affect[ed]" by termination or expiration. *See Agreement* § 13. Although Section 13 does not explicitly refer to "survival," it is logical that provisions that are not "affect[ed]" by termination or expiration would also survive termination or expiration.

Further, the Arbitrator finds persuasive Southfield's argument that Stonington's right to serve as placement agent for the Successor Fund was contingent rather than vested. The Agreement was contingent on many things – Southfield might have decided to terminate or not to terminate the Agreement, or Southfield might have decided not to form the Successor Fund at all. Stonington proffers the United States Supreme Court's recent opinion in *Maine Community Health Options v. U.S.*[1] in support of its vested rights argument – *i.e.*, that because Section 6 says, "[t]he Placement Agents shall have the right to act as placement agent for the Successor Fund . . . ," Stonington's right to serve as placement agent for the Successor Fund was a mandatory, vested right. However, Stonington's reliance on *Maine Community* is misplaced in the present matter, as Section 6 and its "shall" language do not survive Southfield's termination of the Agreement.

With respect to Stonington's interpretation that Section 13's lack of reference to Section 6 means it is unaffected by termination, the Arbitrator finds this argument unconvincing. Both Southfield and Stonington are sophisticated parties who negotiated a contract. It is well-settled that when dealing with sophisticated parties, New York law gives deference to the language used in the contract. *See, e.g., Vermont Teddy Bear Co.* at 475. Here, as a result of the negotiation period and the drafting process, the parties agreed to enumerate nine different provisions in the termination clause that would be unaffected by

---

[1] In *Maine Community Health Options v. U.S.*, the Supreme Court held that the use of the term "shall" constituted a mandatory obligation for the government to pay certain insurers under the Affordable Care Act. There, the relevant clause said the government "shall pay" the insurers a certain sum. *See* No. 18-1023, 590 U.S. ___ (2020) (slip op.).

termination or expiration. A reasonable interpretation supports the conclusion that any sections not expressly listed in the termination provision as unaffected by termination or expiration would not survive the same. Had the parties wished to include Section 6 as one of the provisions not affected by expiration or termination, they were free to do so. Accordingly, the Arbitrator does not believe that Stonington has the right to serve as placement agent for the Successor Fund under Section 6 of the Agreement.

The sole remaining issue is whether Stonington is entitled to any "re-up" fees under Section 3(iv) of the Agreement. The Arbitrator believes they are. Under Section 3(iv), if Southfield accepts an investment from an investor in the Fund, then Southfield shall pay the broker-dealer 50% of the amount that would be otherwise payable if the payment were made to the Fund (*i.e.*, Southfield would pay 1% of any re-up investments). *See Agreement* § 3(iv). Indeed, the plain language of the contract supports the interpretation that Stonington is entitled to re-up fees, as Section 13 of the Agreement provides that Section 3 survives termination. Southfield argues that Stonington is not entitled to any re-up fees because Section 13 states that termination does not affect fees with respect to Investors, which is further defined in the Agreement as persons admitted to the Fund. However, when the contract is read as a whole, Southfield's interpretation does not alter the fact that any re-up fees owing from investments in the Successor Fund would of necessity relate back to earlier investments in the original Fund. Such re-up fees would emanate from compensation Stonington had already earned for its prior work in the original Fund.

Southfield cites *In re Oneida, Ltd.*, 400 B.R. 384, 392 (Bankr. S.D.N.Y. 2009) in support of its proposition that any post-termination fees are strictly limited to investment in the Fund. However, as Southfield notes, *In re Oneida* is meant to protect placement agents to, "ensure that a principal does not receive the benefit of an agent's services and then refuse to pay for those services." *See In re Oneida, Ltd.* at 392. To prohibit Stonington from collecting fees for investments by investors it introduced to the Fund contradicts *In re Oneida*, insofar as it would allow Southfield to receive the benefit of Stonington's services without having to compensate Stonington for the same services. The clear language of the Agreement affords Stonington the right to receive compensation for such work. The Arbitrator finds that Stonington is entitled to "re-up fees" as described in Section 3(iv) with respect to any investments to the Successor Fund from investors who previously invested in the Fund.

Southfield also argues that it is not obligated to pay re-up fees because Southfield did not agree to Profor's rights being assigned to Stonington Securities. However, the Assignment does not alter the Arbitrator's finding that Stonington is entitled to re-up fees. Stonington's work with respect to recruiting investors to the original Fund has concluded. The fact that Stonington chose to re-organize and create its own broker-dealer entity does not affect the work it had already performed. The Arbitrator, therefore, finds that Stonington's repositioning itself by creating its own broker-dealer entity does not change the fact that it is entitled to the re-up fees.

## VII.   CONCLUSION

Accordingly, Southfield's Motion for Dispositive Relief is partially granted and otherwise denied in that the Arbitrator finds that the Agreement was properly terminated by Southfield and that Stonington does not have an automatic right to serve as placement agent for the Successor Fund under the terms of the Agreement. Stonington's Motion for Dispositive Relief is partially granted insofar as to allow Stonington re-up fees pursuant to Section 3(iv) of the Agreement and otherwise denied.

In light of this decision and disposition, other issues raised by the parties need not be addressed herein.

The administrative fees of the AAA totaling $7,000.00 and the compensation and expenses of Arbitrator totaling $99,934.40 are to be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are, hereby, denied.

5/26/2020
Date

Hon. Jonathan Lippman

# EXHIBIT B

## Placement Agent Agreement

This Agreement ("**Agreement**") is entered into as of June 20, 2014, by and between Stonington Capital Advisors, LLC a Delaware Limited Liability Company ("**Stonington**"), and Southfield Capital, LLC (together with its affiliates and successors, the "**Client**"), and Profor Securities, LLC a New York limited liability company,  ("**Profor**"), (Stonington and Profor collectively the "**Placement Agents**").

**WHEREAS**, Client provides investment management services to domestic and offshore investment vehicles and separate accounts, whether now in existence or established hereafter;

**WHEREAS**, Profor is a registered broker-dealer with the U.S. Securities and Exchange Commission ("**SEC**") and member firm of the Financial Industry Regulatory Authority ("**FINRA**"); and members of Stonington are registered representatives of Profor;

**WHEREAS**, Client wishes to engage the Placement Agents to provide referrals and introductions of potential investors to Funds;

**WHEREAS,** the Placement Agents desire to perform such services on the terms and conditions set forth in this Agreement.

NOW, **THEREFORE**, in consideration of the mutual promises set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   **Definitions.**  As used herein:

(a)   "**Affiliate**" means any entity which, directly or indirectly, Controls, is Controlled by, or is under common Control with another entity, and any partnership in which such entity is a partner, and in the case of an individual, family members or family trusts of such individual or his or her family members.  The foregoing definition includes any entity that conforms to the definition as of the date hereof, as well as any entity that conforms to the definition at any time after the date hereof.

(b)   "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through record or beneficial ownership of voting securities, by contract, or otherwise.

(c)   "**Excluded Investor**" means (i) the General Partner, members of the investment team or their affiliates (which, for the avoidance of doubt, excludes investment vehicles with investors other than the General Partner, members of the investment team or their affiliates) (collectively, the "**GP Group**") and (ii) the specific list of all current investors in existing funds managed or advised by the Client as of the date of this Agreement and certain other specifically listed persons attached hereto as Schedule A.

(d)     **"Fund"** means Southfield Partners III (together with any other vehicles, entities or other arrangements created by the Company for the purposes of co-investing, directly or indirectly, with the fund)

(e)     **"Investment"** means a subscription made to the Fund or the Successor Fund by an Investor that has been accepted by the Client in writing.

(f)     **"Investor"** means any person admitted to the Fund other than an Excluded Investor.

(g)     **"Successor Fund"** means the first investment fund (including its parallel funds, if any) formed by Client following the formation of the Fund that has substantially similar investment focus as the Fund.

2.     <u>**Scope of Engagement.**</u>  In connection with  the Placement Agents' engagement hereunder, in accordance with the Placement Agents' customary practices and procedures, and as reasonably needed and requested by Client hereunder, the Placement Agents shall use commercially reasonable efforts to perform the following services with respect to Investors and prospective Investors:

<u>Marketing Phase</u>:

(a)     Attend or participate, when possible, in meetings/conference calls with prospective Investor.

(b)     Prepare representatives of the Client for meetings with prospective Investors.

(c)     Provide customized on-going reporting as part of coordinated follow-up program to facilitate subscriptions.

(d)     Introduce prospective Investors to the Client and facilitate Investments by prospective Investors.

(e)     Advising and assisting the Client in making presentations to prospective Investors, including assistance in the preparation of presentation and marketing materials.

(f)     Advising the Client in preparing a private placement memorandum, limited partnership agreement and other offering materials, and assisting the Client in preparing and presenting responses to diligence requests, questions and reviews by prospective Investors and undertaking activities to assist or facilitate prospective Investors in their investment approval processes.

(g)     Providing such other services in connection with the offer and sale of interests in the Fund as may be mutually agreed upon by the Placement Agents and the Client.

<u>Closing and Subscription Phase</u>:

(a)     Help negotiate any terms specific to a particular prospective Investor and facilitate prospective Investor feedback/issues.

ST-1.2

3.      **Fees to Placement Agents via Profor.**  As compensation for the Placement Agents' services hereunder, Client hereby agrees to pay Profor fees (the "**Fees**") as follows:

(i)      If Client does not accept an Investment from a potential Investor (in Client's sole and absolute discretion), Client shall not be responsible to pay any Fees to Profor hereunder with respect to such potential investor.

(ii)     Client shall pay to Profor a Fee equal to 2.0% of the Investment in the Fund made by each Investor.

(iii)    All payments to Profor of Fees with respect to an Investment by an Investor shall be due and payable in eight (8) equal installments as follows: the first such payment is to be paid within five business days after the closing date of such Investment; and the remaining seven (7) shall be made quarterly within ten business days after the seven (7) successive dates of January 1, April 1, July 1 and October 1 occurring thereafter, beginning with the first January 1, April 1, July 1 or October 1 as the case may be, following such closing date. Notwithstanding the foregoing, the Client's obligation to pay the Fee in respect of an Investor may be delayed in the Client's discretion until the Fund's or the Successor Fund's first capital call.

(iv)     If Client accepts an Investment in the Successor Fund from a Investor that has invested in the Fund, Client shall pay to Profor a Fee equal to 50% of the amount that would otherwise be payable to Profor pursuant to this Agreement if such Investment were made to the Fund.

(v)      In the event that an Investor with respect to whom a Fee is owed to the Placement Agents pursuant to this Section 8 defaults on its commitment to the Fund or the Successor Fund, including by failure to pay to the applicable management fee with respect to such commitment pursuant to the operative documents of the Fund or the Successor Fund, the Placement Agents agree that the Client's obligation to pay the Fee for the portion of such commitment that such Investor defaulted upon shall be suspended until such Investor is no longer in default or has been replaced by another investor regardless of source of introduction, at which time the Client's obligation to pay such Fee shall resume.  This Section 3(v) shall not apply if the defaulting Investor's refusal to honor a capital call occurs after a court of competent jurisdiction finally determines that the Client or its Affiliate has breached its obligations to the Fund or the Successor Fund, as applicable, which breach has caused a material harm to the Fund, the Successor Fund or the defaulting Investor.

(vi)     The Client shall pay to Profor a retainer (the "**Retainer**") equal to $15,000.00 per calendar month, payable on the first business day of each calendar month beginning on July 1, 2014, until the earlier of the first closing of the Fund or a period of five (5) months has elapsed, after which point, the Retainer shall be increased to $25,000.00 per calendar month continuing through the Fund's final close.  Any such aggregate Retainer paid, shall be credited as an offset to the total compensation owed under this Section 3 but shall otherwise be non-refundable.

ST-1.3

(vii)   The Fees hereunder shall be paid to Profor by wire transfer of immediately available funds to a bank account specified in writing by the Placement Agents to Client, within fifteen business days following their becoming payable hereunder.

4.   **Books and Records.**  Client shall keep accurate books and records covering all Investments and Fees to be paid by Client to Profor hereunder. The Placement Agents and their authorized agents shall be granted reasonable access to Client's records and related documentation (which may be redacted to remove Client's confidential information not related to this Agreement), as may be required to audit Profor's Fees due hereunder.

5.   **Expenses.**  All reasonable out-of-pocket expenses specifically and exclusively incurred by the Placement Agents in connection with the performance of its duties hereunder, including Ed Eiland's pre-engagement travel expenses, shall be promptly reimbursed to the Placement Agents by the Client within thirty (30) days of submission of an expense reimbursement request by Stonington, and agreed that any travel expenses incurred not exclusively on the Client's business shall be apportioned as between the Client and the Placement Agents or other business activities on a reasonable basis where appropriate. The Client further agrees that the Placement Agent may travel "business class" for flights over two-thousand, five hundred (2,500) miles and will otherwise fly economy class. The Client will not reimburse the Placement Agents for expenses in excess of $15,000.00 during any calendar quarter without the Client's prior written consent. The Placement Agents agree to provide Client with documentation that supports its expenses hereunder as reasonably requested by Client.

6.   **Successor Funds.**  The Client or its Affiliate shall provide the Placement Agents with written notice of its intent to launch the Successor Fund not fewer than 180 days prior to the first closing of the Successor Fund (the "**Successor Fund Notice**"). The Placement Agents shall have the right to act as placement agent for the Successor Fund upon providing the Client or its Affiliate, as applicable, with notice of their intent to do so delivered not more than 90 days after the date of their receipt of the Successor Fund Notice. The Placement Agents' right in the preceding sentence is conditioned on the Fund having received aggregate Investments of at least $125 million.

7.   **Exclusive Engagement.**  The Placements Agents are the Client's exclusive placement agent for Investors in the Fund, except for as agreed to in writing between the parties.

8.   **Assignment.**  Notwithstanding anything to the contrary in this Agreement, Stonington may in the future become licensed as a broker-dealer or may become associated with a broker-dealer other than Profor. Profor and the Client each hereby agree that if, at any time, Stonington becomes licensed as a broker-dealer or becomes associated with a broker-dealer other than Profor, Stonington may in its discretion elect to assign all of Profor's rights to receive the Fees under Section 3 of this Agreement, subject to the terms of this Agreement, as well as Profor's rights under Section 4 and Section 6 of this Agreement to itself or such other broker dealer it is associated with, (an "**Assignment**") so long as the assignee ("**Assignee**") of the Assignment: (i) agrees to assume all obligations of Profor,  (ii) the assignee of the Assignment makes  all representations and warranties made by Profor under this Agreement and such representations are valid on the date of the Assignment, and (iii) the Assignment, including the assumption of all representations, warranties and obligations and receipt of the Fees of and by the Assignee does not violate any laws  the Placements Agents, the Assignee or the Client is subject to.

ST-1.4

9.   **Representations and Warranties**.

    (a)    Client represents and warrants to the Placement Agents as follows:

        (i)    Client has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement have been duly authorized by all necessary action and this Agreement constitutes a valid and binding obligation, enforceable against Client in accordance with its terms.

        (ii)    No action, suit or proceeding is pending or, to the knowledge of Client, threatened against Client before or by any court, regulatory agency or other governmental authority that brings into question the validity of the transactions contemplated by this Agreement or that could impair the consummation by Client of this Agreement or the transactions contemplated hereby, nor has Client been convicted of any felony or misdemeanor.  In addition, Client shall advise the Placement Agents of any communication from the SEC or any other securities commissioner or regulatory authority in any other jurisdiction concerning the transactions contemplated by this Agreement and the commencement of any lawsuit or proceeding to which Client is a party relating to the transactions contemplated by this Agreement.

        (iii)    Client will ensure (other than with respect to actions taken by the Placement Agents) that the offer and sale of interests in the Fund comply with all applicable U.S. federal and state securities laws and regulations (other than those applicable to the status or activities of Profor).

    (b)    Placement Agents represents and warrants to the Client as follows:

        (i)    The Placement Agents have full power and authority to execute and deliver this Agreement and to perform their respective obligations hereunder.  The execution, delivery and performance of this Agreement have been duly authorized by all necessary action and this Agreement constitutes a valid and binding obligation, enforceable against each of the Placement Agents in accordance with its terms.

        (iii)    No action, suit or proceeding is pending or, to the knowledge of the Placement Agents, threatened against either of Placement Agents before or by any court, regulatory agency or other governmental authority that brings into question the validity of the transactions contemplated by this Agreement or that could impair the consummation by the Placement Agents of this Agreement or the transactions contemplated hereby, nor have the Placement Agents been convicted of any felony or misdemeanor.  In addition, the Placement Agents shall advise the Client of any communication from the SEC or any other securities commissioner or regulatory authority in any other jurisdiction concerning the transactions contemplated by this Agreement and the commencement of any lawsuit or proceeding to which either of the Placement Agents is a party relating to the transactions contemplated by this Agreement.

        (iv)    Profor is a broker-dealer registered with the SEC and Financial Industry Regulatory Authority.

ST-1.5

(v)     At all times as required by applicable law or regulation, the Placement Agents and its members will have all federal, state and foreign governmental, self-regulatory and exchange licenses and approvals and will have effected all filings and registrations with federal, state and foreign governmental and self-regulatory agencies required to conduct its business and to perform its obligations under this Agreement.

(vi)    Neither the Placement Agents,  nor any of their officers, directors, employees, Affiliates or agents is a person (A) subject to an order issued by the SEC under Section 203(f) of the U.S. Investment Advisers Act of 1940, as amended (the "**Advisers Act**"), or (B) convicted within the previous ten years of any felony or misdemeanor involving conduct described in Section 203(e)(2)(A)-(D) of the Advisers Act, or (C) who has been found by the SEC to have engaged, or has been convicted of engaging, in any of the conduct specified in paragraph (1), (5) or (6) of Section 203(e) of the Advisers Act, or (D) is subject to an order, judgment or decree described in Section 203(e)(4) of the Advisers Act.  The Placement Agents shall immediately notify the Client when and if it or any of its officers, directors, employees, Affiliates or agents becomes a person described in the immediately preceding sentence.

(vii)   Neither the execution of this Agreement by the Placement Agents, the performance of the Placement Agents' obligations hereunder, nor the receipt by Profor of the Fees will violate any applicable laws, rules or regulations of any jurisdiction or any agreement, instrument or other undertaking to which either of the Placement Agents is a party or by which either of the Placement Agents is bound.

(viii)  The Placement Agents shall perform its duties under this Agreement in accordance (A) with all material requirements of all applicable laws, rules and regulations, including, without limitation, the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and Regulation D thereunder, the U.S. Securities Exchange Act of 1934, as amended, the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**") (insofar as it relates to the Fund maintaining exemptions under Section 3(c)(1) or Section 3(c)(7), as applicable), the laws of any state or territory of the United States and any other non-U.S. country in which the Placement Agents engages in any activity.

(ix)    The Placement Agents will engage in no act or practice that would, directly or indirectly, constitute a general solicitation or general advertising for purposes of Regulation D under the Securities Act or contravene the U.S. Foreign Corrupt Practices Act, as amended, or if applicable, the USA PATRIOT Act of 2001, as amended, or any similar statute applicable in any jurisdiction in which either the Placement Agent engages in any activity, that prohibits bribery or payments to public officials, including, without limitation, any policies of any governmental or quasi-governmental agency implementing or enforcing the foregoing.

(x)     Each of the Placement Agents holds all necessary licenses or registrations and shall maintain such licenses and registrations in full force and effect to the extent necessary or appropriate under applicable law to carry on the business contemplated by this Agreement.

10. **Relationship of Parties.**  Client acknowledges that Client's engagement of the Placement Agents is each as an independent contractor and not in any other capacity including as a fiduciary or a principal in any transaction.  The Placement Agents acknowledge that they are not  (a) a partner, officer, director, employee, affiliate, agent, or associated person of the Client or the Fund or any affiliate thereof or (b) may bind the Client or the Fund.  The Placement Agents agree that neither it nor any of its employees or agents are authorized to make any representations concerning the Client or the Client's services, except as otherwise provided herein. Unless pursuant to an Assignment, this agreement is not intended to confer rights upon any persons not a party hereto.

11. **Confidentiality**.  The Placement Agents agree (a) to keep in strict confidence the all information (including proprietary and non-public information) related to the Client or any of its Affiliates, the Fund or the Investors (including any information related to portfolio companies owned or held previously by other investment funds managed by such Affiliates) as provided to the Placement Agents under the terms of this Agreement or otherwise (any such information supplied by the Client, the "Confidential Information"); (b) not to use the Confidential Information for any purposes other than those pursuant to the terms of this Agreement; and (c) not to disclose the Confidential Information to any person, in any manner, without the prior written consent of the Client.  To the extent the Placement Agents provides the Client with non-public information, the Client agrees to hold such information confidential.

12. **Indemnification.**

    (a)    Client agrees to indemnify, defend and hold harmless the Placement Agents and their Affiliates and each of their respective members, partners, officers, directors, employees, Affiliates and agents from and against any and all losses, claims, damages, costs, liabilities or expenses (including reasonable attorney's fees and expenses), joint or several (collectively, "**Losses**"), to which either of the Placement Agents or their Affiliates or their respective members, partners, officers, directors, employees, Affiliates or agents may become subject in connection with any material breach of any agreement, representation, warranty, covenant or other obligation under this Agreement by Client; provided, however, that Client shall not be liable in any such case to the extent that any such Losses result from fraud, gross negligence or willful misconduct of the Placement Agents (or by any other indemnified person under this paragraph).

    (b)    The Placement Agents agree to indemnify, defend and hold harmless the Client, its Affiliates, the Fund, and each of their respective members, partners, officers, directors, employees, Affiliates and agents from and against any and all Losses to which the Client, its Affiliates, the Fund, the Successor Fund or their respective members, partners, officers, directors, employees, Affiliates or agents may become subject in connection with any material breach of any agreement, representation, warranty, covenant or other obligation under this Agreement by the Placement Agents; provided, however, that the Placement Agents shall not be liable in any such case to the extent that any such Losses result from fraud, gross negligence or willful misconduct of Client (or by any other indemnified person under this paragraph).

13. **Term; Termination.**  The placement Agents' engagement will commence on the date hereof and will continue until the date of the final closing of the Fund (the "**Term**"); provided, that either the Client, Profor or Stonington may terminate this Agreement at any time on thirty (30) days' advance written notice, or immediately on written notice to the other party if the other party is in material breach of any representation, warranty, covenant or other obligation under this

ST-1.7

Agreement that has not been cured within a reasonable amount of time after delivery of notice of such breach (if remedy is possible).  No expiration or termination of this Agreement will affect the matters set out in this Section or in Section 3 with respect to an Investor who is approached by a member of the Placement Agents regarding in connection with its duties under this Agreement or for accrued and unpaid expenses incurred prior to the expiration or termination of this Agreement), and Sections 4, 9, 10, 11, 12, 13, 14 and 15 of the Agreement.

14.   **Governing Law; Arbitration.**  This Agreement shall be governed, construed and interpreted in accordance with the laws of the State of New York without regard to the conflicts of laws provisions therein.  Any disputes between the parties relating to the terms of this Agreement, or the breach thereof, shall be submitted to binding arbitration in New York, New York, in accordance with the rules of the American Arbitration Association.  In the event that either party desires to arbitrate any such dispute, such party shall so notify the other party and the parties shall endeavor, for a period of thirty (30) days, to resolve such dispute without arbitration.  In the event that the parties cannot resolve the dispute within such 30-day period, then within ten (10) days thereafter, the parties shall jointly designate an arbitrator to hear the dispute, or, if the parties are unable to jointly select an arbitrator, an arbitrator shall be chosen by the President of the American Arbitration Association from lists of candidates provided by each of the parties.  The decision of the arbitrator shall be binding upon the parties.  The parties hereby waive any right they may have to a trial by jury in respect of any claim brought by or on behalf of either party based upon this Agreement.

15.   **Notices.**   All communications as they relate to this Agreement shall be sent to the following address:

        If to the Client:
        Southfield Capital, LLC
        53 Greenwich Ave, 2nd Floor
        Greenwich, CT 06830
        Telephone: 203-813-4100
        Email: jgoldstein@southfieldcapital.com
        Attention: Jon Goldstein

        If to Stonington:

        Stonington Capital Advisors, LLC
        183 Madison Avenue, Suite 1515
        New York, New York 10016
        Telephone: 646-8636431
        Email: garrod@stoningtoncapital.com
        Attention:  Justin M. Garrod

        If to Profor:

        Profor Securities, LLC
        708 Third Avenue, 5th Floor
        New York, New York 10017
        Telephone: (646) 202-2969
        Email: pjo@proforadvisors.com
        Attention:  Patrick J. O'Meara

ST-1.8

All notices or other communications or deliveries required or permitted to be made hereunder shall be in writing and shall be given by letter (delivered by personal delivery, overnight courier, registered air mail or certified mail, return receipt requested) or by facsimile transmission and shall be deemed effective upon receipt.

16.   **Miscellaneous.**  This Agreement shall constitute the entire agreement between the parties hereto and supersedes all prior understandings or agreements between the parties, whether oral or written, express or implied.  The headings on each Section hereof are for convenience purposes only and shall not be used to construe the terms of this Agreement.   None of the terms or provisions of this Agreement may be amended, supplemented, waived or otherwise modified except by a written instrument executed by each of the parties hereto. No failure to exercise, nor any delay in exercising, on the part of any party hereto, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by any party hereto of any right or remedy hereunder on any one or more occasions shall not be construed as a bar to any right or remedy that any party hereto would otherwise have on any future occasion.   No party hereto may assign any of its rights or obligations under this Agreement to any person or entity without the prior written consent of the other party hereto, except that the rights and obligations of Client hereunder may be assigned by Client to an Affiliate of Client.  This Agreement shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of Client and the Placement Agents.  If it is found by a court of competent jurisdiction that any term or provision hereof is invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired and shall remain in full force and effect and (b) the invalid or unenforceable provision or term shall be replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term or provision.  Any facsimile or electronic signature of this Agreement or any other document contemplated by this Agreement will constitute the legal, valid and binding execution thereof by such person or entity. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, this Placement Agent Agreement dated June 20, 2014 has been executed for and on behalf of the undersigned as of the above date.

**Profor Securities, LLC**

By: _____
        Name: Patrick O'Meara
        Title: President

**Southfield Capital, LLC**

By: _____
        Name: A. Andrew Levison
        Title: Managing Partner

**Stonington Capital Advisors, LLC**

By: _____
        Name: Dana Pawlicki
        Title: Managing Partner

ST-1.9

All notices or other communications or deliveries required or permitted to be made hereunder shall be in writing and shall be given by letter (delivered by personal delivery, overnight courier, registered air mail or certified mail, return receipt requested) or by facsimile transmission and shall be deemed effective upon receipt.

16.   **Miscellaneous.**   This Agreement shall constitute the entire agreement between the parties hereto and supersedes all prior understandings or agreements between the parties, whether oral or written, express or implied.   The headings on each Section hereof are for convenience purposes only and shall not be used to construe the terms of this Agreement.   None of the terms or provisions of this Agreement may be amended, supplemented, waived or otherwise modified except by a written instrument executed by each of the parties hereto. No failure to exercise, nor any delay in exercising, on the part of any party hereto, any right, power or privilege hereunder shall operate as a waiver thereof.   No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.   A waiver by any party hereto of any right or remedy hereunder on any one or more occasions shall not be construed as a bar to any right or remedy that any party hereto would otherwise have on any future occasion.   No party hereto may assign any of its rights or obligations under this Agreement to any person or entity without the prior written consent of the other party hereto, except that the rights and obligations of Client hereunder may be assigned by Client to an Affiliate of Client.   This Agreement shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of Client and the Placement Agents.   If it is found by a court of competent jurisdiction that any term or provision hereof is invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired and shall remain in full force and effect and (b) the invalid or unenforceable provision or term shall be replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term or provision.   Any facsimile or electronic signature of this Agreement or any other document contemplated by this Agreement will constitute the legal, valid and binding execution thereof by such person or entity. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, this Placement Agent Agreement dated June 20, 2014 has been executed for and on behalf of the undersigned as of the above date.

**Profor Securities, LLC**

By: _(signature)_
Name: Patrick O'Meara
Title: President

**Southfield Capital, LLC**

By: _(signature)_
Name: A. Andrew Levison
Title: Managing Partner

**Stonington Capital Advisors, LLC**

By: _(signature)_
Name: Dana Pawlicki
Title: Managing Partner

9

ST-1.10